IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 11, 2005 Session

## KELLI WHITESIDE v. MICHAEL A. HEDGE, ET AL.

**Appeal from the Circuit Court for Knox County**
**No. 1-15-02      Dale C. Workman, Judge**

---

**No. E2004-02598-COA-R3-CV - FILED MAY 26, 2005**

---

The sole issue in this case is whether extraneous prejudicial information was improperly brought to the attention of the jury.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

WILLIAM H. INMAN, SR. J., delivered the opinion of the court, in which D. MICHAEL SWINEY and SHARON GAIL LEE, J.J., joined.

Clifford Wilson, Nashville, Tennessee, attorney for appellant, Kelli Whiteside.

James S. MacDonald, Knoxville, Tennessee, attorney for appellees, Michael A. Hedge and Paul Hedge.

**OPINION**

This is an action for damages for personal injuries resulting from a rear-end collision on January 15, 2001. Liability was admitted, and the proof focused on the nature and extent of the plaintiff's injuries.

The plaintiff was a nineteen-year-old student who was ambulatory immediately after the accident. She missed two days of school throughout the winter/spring of 2001, worked for a bank during the summer of 2001, and returned to school in 2002 taking an extraordinary amount of pain medication.

At the time of the trial of this case, which was concluded on May 3, 2004, the plaintiff had been seen by a veritable host of physicians for her complaints of pain. Her medical problems perhaps began in her early teens when she suffered from depression which continued intermittently to the time of the accident. The precise cause of her pain was elusive; although in her brief she asserts that two of her physicians testified that they diagnosed her condition as syringomyelia, the only physician who used this term, Dr. Fred Killeffer, a neurosurgeon, testified that the plaintiff was

not suffering from syringomyelia, but had a benign congenital anomaly known as persistent 'embryonic central canal.' Several physicians believed that part of the pain the plaintiff suffers is caused by syrinxs in her spine, a condition which involves pockets of cerebral spinal fluid which forms on the spinal cord.

The plaintiff has incurred medical expenses amounting to $60,000.00 since the accident. Two physicians testified that these expenses were related to the accident, one of these physicians said that the plaintiff would require up to $5,000.00 per year of prescription medication for the remainder of her life. Dr. Kelleffer testified that only the first few weeks of the plaintiff's medical treatment was related to the accident and that in his opinion she did not suffer from syringomyelia. The plaintiff testified that she was following the advice of Dr. Killeffer and a different pain management physician and had not taken any pain medication for several weeks prior to trial.

The jury returned a verdict for $25,000.00 and the plaintiff appeals the disallowance of her motion for a new trial which alleged no grounds. The affidavit of juror Batchellor was submitted, together with a memorandum of law in support of the motion, which, taken together, allege that the foreman of the jury conducted his own research on the Internet about syringomyelia and shared this information with the other jurors.

## Discussion

We reproduce the affidavit:

AFFIDAVIT
_____

Comes now Aaron Batchellor, who after first being duly sworn, says as follows:

1. I was a member of the jury in the above captioned matter which was tried on April 30, 2004 and concluded on May 3, 2004.

2. The foreman of our jury, Clifford Watson, during our deliberation, told me and the other jurors that he had done some research on the Internet about syrinx's. He shared with us what he had learned on the Internet.

3. I am not sure what effect the information Mr. Watson shared with us had on the ultimate outcome of this case.

Further Affiant Saith Not.

(*Signature of Aaron Batchellor*)  5/13/04
Aaron Batchellor

The disposition of this case is governed by Rule 606(b) of the Tennessee Rules of Evidence. It provides:

> (B) Inquiry Into Validity of Verdict or Indictment.
> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

There are only three instances in which a juror may offer testimony, or, as here, an affidavit, concerning the validity of a verdict:

1. If " . . . extraneous prejudicial information was improperly brought to the jury's attention."

2. If "any outside influence was improperly brought to bear upon any juror." Or

3. If " . . . a juror agreed in advance to be bound by a quotient or gambling verdict."

The only exception relevant to this case, is whether extraneous *prejudicial* information was improperly brought to the jury's attention.

In *State v. Blackwell*, 664 S.W.2d 686 (Tenn. 1984) the Supreme Court specifically adopted Federal Rule of Evidence 606(b) (identical to current Tenn. R. of Evid. 606(b) with the exception that the federal rule does not include a specific reference to quotient verdicts) as the rule governing the exclusion and admissibility of evidence to impeach a jury verdict in Tennessee. *Blackwell* is clear on the point that the "outside influence" element of 606(b) relates to *third party contact with the jury*. The *Blackwell* court acknowledged that different rules might apply to sequestered and non-sequestered juries. The jury in this civil case was not sequestered. Even though the "outside influence" test does not contain the same "prejudicial" qualifier as in the "extraneous prejudicial information" test, the "outside influence" test provides "whether any outside influence was

*improperly* brought to bear upon any juror." In practical effect, the ***Blackwell*** court defined the "outside influence improperly brought to bear upon any juror" test in terms of the prejudicial effect of such outside influence, stating:

> We agree with the Court of Criminal Appeals that something more than a bare showing of a mingling with the general public is required where the jury is not sequestered to shift the burden of proof to the State of showing no prejudice. The additional requirement is that as a result of a juror's contact with a third person some extraneous prejudicial information, fact or opinion, was imported to one or more jurors or some outside improper influence brought to bear on one or more jurors, ***Blackwell***, p. 689.

The appellees argue that there is no "outside influence" claim involving third parties being made by the plaintiff but rather that she only advances "extraneous prejudicial information" claim. But under either test the burden of proof is on the appellant to prove prejudice. The affidavit of Mr. Batchellor reveals that he was one of the jurors selected in this case who selected Clifford Watson as foreman and who told Mr. Batchellor and the other jurors:

> . . . that he had done some research on the Internet about syrinx's [sic]. He shared with us what he had learned on the Internet. I am not sure what effect the information Mr. Watson shared with us had on the ultimate outcome of this case.

We agree with the appellees that the precedential cases reveal that clear and convincing evidence of prejudice is required to meet the standards of Tennessee Rules of Evidence 606(b). The affidavit does not reveal the extent of the research, or what, if anything, Mr. Watson learned.

One of the cases relied on by the appellant, ***Caladaro v. Vanderbilt University***, 794 S.W.2d 738 (Tenn. Ct, App, 1990), involved a nursing malpractice claim. The two basic holdings of the ***Caladaro*** court are: (1) the affidavits of two jurors stating that one juror repeatedly read his notes to the other jurors during their deliberations despite the instructions of the trial court to the contrary were inadmissible, based on the fact that this information was deemed to be "intrinsic" rather than "extrinsic" information, and as such, inadmissible for consideration by a reviewing court pursuant to Tennessee Rules of Evidence 606(b), and (2) the fact that the same juror repeatedly told his fellow jurors that he was married to a nurse, and therefore had specialized knowledge of what nurses would do, was held to be part of the "normal jury deliberations that include discussions based on the jurors' generalized knowledge and experience [that] do not constitute grounds for overturning a verdict." The court pointed out that the juror in question was not said to have had any prior or extraneous knowledge of the parties or events that gave rise to the suit, and applying that principle to this case, neither has it been suggested that the jury foreman in this case had any prior or extraneous knowledge whatever of the parties or the events giving rise to the lawsuit.

-4-

The case of ***Cavalier Metal Corporation v. Johnson Metal Controls***, 124 S.W.3d 122 (Tenn. Ct. App. 2003) is instructive.  In ***Cavalier*** the plaintiff corporation obtained a $2,029,294.00 jury verdict against the defendant corporation for breach of contract.  A juror who had been challenged for cause by the defendant corporation who had fired her for absenteeism shared her opinions that while she was working for the defendant, it breached the contract first and that the quality of the parts provided by the plaintiff corporation were no worse than those furnished by other suppliers.  This was held to be "extraneous, prejudicial information."  The ***Cavalier*** decision is further instructive in setting out the analysis to be followed in cases such as this: (1) the threshold inquiry is whether or not the information is "extraneous" and, (2) if "extraneous, whether or not said information was prejudicial, and (3) finally, if both extraneous and prejudicial, whether said extraneous prejudicial information had an influence on the jury, citing ***Patton v. Rose***, 892 S.W.2d 410, 414 (Tenn. Ct. App. 1994).  In ***Patton*** the court found that a newspaper shared with the jury was clearly extraneous information but that the information was not prejudicial to the plaintiff and that there was no evidence that this newspaper article affected the jurors in their deliberations.  Where there has been no showing whatever concerning the specifics of the information shared with the jury, we cannot conclude that this information was "prejudicial" or that it had an influence on the jury.  This determination is reinforced by reference to the affidavit of Mr. Batchellor who specifically states that "I am not sure what effect the information Mr. Watson shared with us had on the ultimate outcome of the case."

The record does not reveal the reason(s) why juror Batchellor and foreman Watson were not subpoenaed to testify.  In her brief the appellant merely states:

> Plaintiff does not know what internet articles the jury foreman, Mr. Watson, reviewed during his internet research.  Plaintiff does not know what facts or information was shared by Mr. Watson with his fellow jurors regarding the information he found during his outside research.

We agree with the appellee that more than appellant's admitted inability to provide any specifics concerning the information shared with the jury is necessary to set aside the verdict in this case.  We also note that it was the appellant who initially rejected "articles off the Internet" into the trial of the case by cross examining Dr. Fred Killeffer about an article he had seen on the Internet from the National Institute of Neurologic Diseases and Stroke, and made this Internet article and Exhibit to the Deposition of Dr. Killeffer.  All concerned apparently agreed that this article from the Internet was authoritative.  The record does not reveal any specific information obtained by the foreman, but if it may be inferred that the Internet information was similar to the information elicited by the cross-examination of Dr. Killeffer, there can be no possible prejudice to the appellant.  In any event, we cannot agree with the appellant's argument that the award of $25,000.00 "displays that something happened in the juror room to sway the jury in favor of the defendant."  We can neither infer nor presume prejudice resulted to the plaintiff, or for that matter, to the defendants, on account of the foreman's statements.  As in ***Patton v. Rose,*** *supra*:

It is clear from this record, however, that there is absolutely no evidence that the jury considered this article in their deliberations, nor is there any evidence that the article itself influenced deliberations of the jury . . . and there is nothing in the record to indicate that the jury used the extraneous information in any manner in reaching its verdict.

The judgment is affirmed at the costs of the appellant, Kelli Whiteside.

_____
WILLIAM H. INMAN, SENIOR JUDGE